## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **DEVIN TUCKER** | * | **CASE NO.** |
| | * | |
| **VS.** | * | |
| | * | |
| **JOSEPH P. LOPINTO, III IN HIS** | * | |
| **OFFICIAL CAPACITY AS SHERIFF** | * | |
| **OF JEFFERSON PARISH,** | * | |
| **JOHN DOE #1, JOHN DOE #2,** | * | |
| **EAST JEFFERSON GENERAL** | * | |
| **HOSPITAL, SEASIDE HEALTHCARE,** | * | |
| **LLC, ABC INSURANCE COMPANY,** | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## <u>COMPLAINT WITH JURY DEMAND</u>

NOW INTO COURT, through undersigned counsel, comes the Plaintiff, Devin Tucker

("Mr. Tucker"), who resides and is domiciled in Jefferson Parish, and respectfully represents the

following:

### PARTIES
1.

Made Defendants herein are the following:

a) SHERIFF JOSEPH LOPINTO, is and was at all relevant times the Sheriff of the
   Jefferson Parish Sheriff's Office ("JPSO"), a person of full age and majority
   domiciled in Jefferson Parish. He is sued in his official capacity;

b) JOHN DOE #1, is and was at all relevant times a deputy of the Jefferson Parish
   Sheriff's Office ("JPSO"), a person of full age and majority domiciled in Jefferson
   Parish. He is sued in his individual capacity;

c) JOHN DOE #2, is and was at all relevant times a deputy of the Jefferson Parish
   Sheriff's Office ("JPSO"), a person of full age and majority domiciled in Jefferson
   Parish. He is sued in his individual capacity;

1

d) SEASIDE HEALTHCARE, LLC (hereinafter sometimes referred to as "Seaside"), a Louisiana company whom is domiciled in Caddo Parish, State of Louisiana and has a principal place of business in Jefferson Parish, State of Louisiana;

e) EAST JEFFERSON GENERAL HOSPITAL (hereinafter sometimes referred to as "EJGH"); a Louisiana healthcare provider with whom is both domiciled and has a principal place of business in Jefferson Parish, State of Louisiana;

f) ABC INSURANCE COMPANY, an insurance company authorized to do, and doing business in the State of Louisiana providing general liability coverage for Sheriff Lopinto, JPSO, or any of its deputies, for any and all acts and damages occurring from this incident;

g) XYZ INSURANCE COMPANY, an insurance company authorized to do, and doing business in the State of Louisiana providing general liability coverage for Seaside Behavioral Center and/or East Jefferson General Hospital, for any and all acts and damages occurring from this incident;

h) At all times relevant to this Complaint, all law enforcement defendants acted under the color of state law.

i) THIS PETITION PUTS ON NOTICE ANY EXCESS POLICY COVERING SHERIFF LOPINTO OR ANY OF THE NAMED DEPUTY/OFFICER DEFENDANTS.

## JURISDICTION AND VENUE

2.

The United States District Court has jurisdiction over the subject matter of this complaint under 42 U.S.C. 1983 and 28 U.S.C. 1331, 1343(a)(3), and 1367(a).

3.

The Eastern District of Louisiana is the appropriate venue to bring this complaint, because the facts that give rise to Plaintiff's claims all took place within the Eastern District of Louisiana.

**FACTUAL ALLEGATIONS SURROUNDING DECEMBER 16, 2020 UNTIL**

**DECEMBER 25, 2020.**

4.

At all times relevant to this complaint, all defendants acted in concert and conspiracy and were jointly and severally responsible for the harms caused to plaintiff. Defendants John Doe #1 and John Doe #2 were law enforcement agents with the Jefferson Parish Sheriff's Office who participated in the violent arrest of Mr. Tucker and declined him medical treatment.

5.

Devin Tucker is a 24-year-old young man who suffers from schizophrenia and bipolar disorder and has been previously involuntarily committed.

6.

On the evening of December 16, 2020, Mr. Tucker was in the midst of a psychiatric breakdown when his loving mother, Shalon Tucker—desperately seeking help for her suffering son— contacted the Jefferson Parish Coroner's Office.

7.

The coroner's office responded, deeming Devin as a threat to others and ordering him to be brought to the West Jefferson Medical Center for immediate psychiatric examination and treatment.

8.

Nevertheless, John Doe #1 and John Doe #2—deputies from JPSO— ignored these orders and instead violently arrested him outside the coroner's office. Confused and disoriented, Mr. Tucker did his best to comply with the commands from the deputies, but nevertheless, John Doe #1 and John Doe #2 ruthlessly and brutally arrested him, causing him severe injury.

9.

John Doe #1 and John Doe #2 then made jokes and laughed about their savage treatment of Mr. Tucker.

10.

John Doe #1 and John Doe #2 then brought Mr. Tucker to jail in Gretna, LA rather than to the hospital as they were so ordered.

11.

While incarcerated and suffering a schizophrenic episode, Devin was not offered the support and treatment that he so urgently needed. Instead, he was kept alone in a dark room for two days.

12.

Mr. Tucker's mother, Shalon Tucker, believing that he had been brought to the hospital, only later discovered he was actually in jail when someone with a family member there alerted her that he was there and had been beat up by deputies. Terrified and alone, Mr. Tucker had not been allowed to call his own mother to tell her what was done to him.

13.

While Mr. Tucker was in jail—deprived of medical and psychiatric treatment—Shalon tried numerous times to bail him out so that she could find him appropriate medical care. A nurse at the jail informed Shalon that JPSO had conducted their own investigation and they felt nothing was wrong with Mr. Tucker.

14.

Finally, after four long excruciating days, Mr. Tucker's family was informed that he was transferred to a hospital and would be released into NOPD custody after a 10-day hold.

15.

After first being brought to West Jefferson Medical Center, Mr. Tucker had been transported by ambulance to East Jefferson General Hospital ("EJGH").

16.

Upon admittance to EJGH, medical staff noted that Mr. Tucker suffered from visible abrasions to his legs, presumably from his brutal arrest by John Doe #1 and John Doe #2.

17.

After being evaluated, Mr. Tucker was transferred into the care of Seaside Behavioral Center, which is housed in and run by EJGH.

18.

While in the care of the Seaside Behavioral Center/East Jefferson General Hospital, Mr. Tucker once again slipped into a serious mental health crisis.

19.

Mr. Tucker did not attend group sessions, but consistently paced the halls of the hospital, which was noted by Seaside staff.

20.

On Christmas morning, nine days after Shalon Tucker had called for help for her son, Mr. Tucker was carelessly and recklessly left unsupervised by EGJH staff and attempted to escape by jumping from the window of his room, three stories from the ground.

21.

As a result, Mr. Tucker suffered grievous physical injuries, fracturing both of his feet and his tailbone.

22.

Due to the abject failure and unconscionable behavior of the Jefferson Parish Sheriff's

Office and John Does #1-2, and the inexplicable negligence of the East Jefferson General Hospital, Devin and his family have endured severe and life-altering trauma.

23.

At all times relevant to this Complaint, the conduct of Defendants John Doe #1 and John Does #2 were in willful, reckless, and callous disregard of Mr. Tucker's rights under federal and state law.

24.

As a direct result and proximate result of the conduct of all Defendants, the Plaintiff suffered and continues to suffer extraordinary damages, including the painful injuries to his feet and back, emotional distress, and trauma, loss of the enjoyment of life, psychological harm, and pain and suffering, some of which may be permanent.

## FACTUAL ALLEGATIONS SURROUNDING EMPLOYMENT, TRAINING, SUPERVISION, AND DISCIPLINE OF JPSO OFFICERS

25.

The Sheriff of Jefferson Parish at all relevant times before, during, and after this incident was Joseph Lopinto, making him the responsible decisionmaker and policymaker for the JPSO.

26.

In Sheriff Lopinto's official capacity, he was and is responsible for adopting, implementing, promulgating, and enforcing policies, customs, and practices pertaining to making arrests and preserving peace in Jefferson Parish.

27.

Additionally, Sheriff Lopinto is responsible for the screening, hiring, disciplining, training, supervising, and the retraining of JPSO deputies to ensure each officer was and is qualified and properly trained to perform the duties and functions of a peace officer including making arrests, preserving the peace, and the constitutional use of force. Sheriff Lopinto has a responsibility in supervising and enforcing and implementing these training, discipline, and enforcement of these policies, customs, practices.

28.

Based on the extreme misconduct of Defendants John Doe #1 and John Doe #2, and upon information and belief, Defendant Lopinto did not properly examine and scrutinize the background of the Defendants John Doe #1 and John Doe #2.

29.

Based on the extreme misconduct of Defendants John Doe #1 and John Doe #2, and upon information and belief, Defendant Lopinto did not properly train, supervise, and/or discipline Defendants John Doe #1 and John Doe #2 with regard to proper police practices.

30.

Upon information and belief, in willful, reckless, and callous disregard to Mr. Tucker's life and rights under federal and state law, Defendant Lopinto did not have an adequately trained upon, promulgated, and enforced use of force policy in place for the JPSO at all relevant times upon which officers were sufficiently or adequately trained so as to know what extent of force is appropriate in situations. Additionally, Sheriff Lopinto did not have an adequately trained upon, promulgated, and enforced policy regarding treatment of citizens experiencing mental health emergencies, including procedures for following the coroner's order for immediate treatment.

7

31.

Despite Jefferson Parish being a majority white parish, there is an overt policy and practice whereby people of color are disproportionately stopped, detained, harassed, subjected to use of force, and shooting by JPSO deputies. Lopinto has endorsed this policy by failing to correct it or taking any disciplinary or corrective actions.

32.

Numerous state and federal lawsuits against Sheriff Lopinto and his deputies demonstrate a pattern, custom, and practice of excessive use of force, especially against people of color. These suits include, but are not limited to, the following:

A.  In 2020, the Sheriff and his deputies were sued:
    a.  After two deputies sat on a handcuffed autistic child for nine minutes and six seconds, suffocating and killing him. His parents were there and had to witness the violent death of their child at the hands of police. There had been at least three previous federal lawsuits against the Sheriff and his deputies alerting them to the dangers of death by positional asphyxiation and training on the same, demonstrating the Sheriff's prior knowledge but failure to properly retrain, supervise, and discipline his deputies;
    b.  After plain clothes officers in unmarked vehicles surrounded unarmed men in a parking lot and fired over 20 rounds into their car, killing one and severely wounding the other. It is further alleged that deputies withheld medical care from both men, and the passenger, who was critically wounded, was forced to remain in the car for 1-2 hours after the shooting occurred. The deputies fired with such careless and reckless disregard that one of their bullets struck a fellow deputy;
    c.  For striking a man in the face with a service weapon while he knelt on the pavement with his arms handcuffed behind his back, and then repeatedly kicking him in the head;
    d.  For excessive force and violation of First Amendment rights after brutally arresting a college-aged pedestrian who was quietly documenting police violence on his cell phone. One of the deputies involved had previously been terminated from at least one other law enforcement position because of instances of misconduct, and another had been a defendant in a prior civil rights case involving excessive force and wrongful arrest;
    e.  After an officer working in the prison repeatedly verbally and sexually assaulted an inmate, forced him to perform oral sex on him, and threatened retaliation if his actions were reported.

B.  In 2019, the Sheriff and his deputies were sued:

    a.  After shoving a woman who was eight-months pregnant stomach-first into a desk, and then slapping and punching her in the face as her 2-year-old child watched. The force of the push was so violent that it caused the vulnerable woman to expel vaginal fluid. Despite the fact that this fluid could have been a sign of detriment to her unborn child, the officers attempted to book her into jail rather than bringing her to the hospital;

    b.  After fatally choking a man in their custody in a case eerily similar to that of George Floyd. This was the second time in mere months that one of the deputies involved was accused in a federal lawsuit of using excessive force;

    c.  For verbally and physically accosting female children in a mall parking lot as they attempted to leave. When the mother of one of the children asked why her 11-year-old was being arrested, she, too was forcibly thrown against the wall and arrested. The degree of force with which she was handled caused her pants to fall down in front of hundreds of onlookers.

C.  In 2018, the Sheriff and his deputies were sued:

    a.  For firing AR-15s and handguns into a vehicle moving out of a parking space, striking the driver and causing the vehicle to continue forward, eventually landing in a drainage canal. The plaintiff was in a coma for one week and in the hospital for four weeks. He has undergone numerous surgeries and now lives with bullet fragments in his face;

    b.  For violently beating a man as he lay face-down on the ground with his arms handcuffed behind his back. The plaintiff lost consciousness during the encounter due to severe blows to his head. The blood pouring from his head wound was so voluminous that it puddled on the ground, soaked his clothes, and splattered onto a nearby vehicle;

    c.  For the use of deadly force against a man when, without identifying themselves as police or any prior warning, they shot him in the back as he fled on foot. The victim suffered temporary paralysis, was restricted to a wheelchair for a long period of time, and is permanently disabled;

    d.  For ramming a man with their police vehicle and then viciously beating, kicking, and stomping him as he lay on the ground already suffering catastrophic injury. In this suit, the plaintiff listed five other previous federal complaints against the deputies involved, but no disciplinary action or termination had resulted against them, despite the Sheriff's knowledge of their misconduct;

    e.  For confiscating plaintiff's monetary property during a traffic stop and refusing to return the entire amount. When the plaintiff objected, a deputy choked and struck him repeatedly. They then arrested him and inexplicably brought him to his daughter's school so that she could see him in handcuffs;

    f.  After deputies—including Defendant Deputy Parker— handled a citizen so aggressively that he suffered broken bones and torn ligaments in his ankle and hand;

D.  In 2017, the Sheriff and his deputies were sued for the excessive force and detention of a 74-year-old tourist and doctor from Switzerland. The elderly man's head was forcefully pushed against the wall during his arrest. He was then caged and required to stand with his arms handcuffed behind his back for hours, despite his age. He was later brought to

jail where deputies refused him the right to call his embassy or consulate for assistance.

E.   This disturbing and upsetting list of lawsuits is sadly not exhaustive. There are numerous other lawsuits against Sheriff Lopinto and his deputies not listed herein.

Alarmingly, at least 12 men and boys have died during an arrest or pursuit by the Jefferson Parish Sheriff's Office since 2015, according to an NBC News review of news articles and documents. All were Black or Latino. Three were under the age of 18.

33.

The above lawsuits show the incident with Mr. Tucker is not an outlier, but rather part of a continuing pattern, custom, and practice of JPSO under the direction and supervision of Sheriff Lopinto. Rather than address these issues, Sheriff Lopinto continues to deny and ignore them.

34.

Despite JPSO being one of the state's largest and best resourced offices with its own crime lab, helicopter and a raft of military-grade equipment, including BearCat armored tanks, Sheriff Lopinto refuses to implement the use of body-worn cameras as a mechanism of transparency to the public and accountability for the actions of his deputies. In fact, Sheriff Lopinto's office is the largest state law enforcement agency not to utilize body-worn cameras. Indeed, in response to an approximately 200-person protest in 2020 to the JPSO's killing of Modesto Reyes, JPSO deployed actual tanks. Sheriff Lopinto is on camera stating he has chosen not to wear body-cameras.

35.

Upon information and belief, Sheriff Lopinto has not changed his hiring, training, or supervision policies and their enforcement despite the numerous use of force complaints and

lawsuits, including those listed in paragraph X.

36.

Further, Sheriff Lopinto has a history of not properly disciplining or firing officers when they engage in illegal or improper conduct, including excessive use of force.

37.

Defendants' John Doe #1 and John Doe #2 extreme misconduct was a product of this environment and undertaken pursuant to de facto policies, practices, and/or customs—both written and unwritten—of the JPSO. Sheriff Lopinto is guilty of the following wrongful acts, including but not limited to:

1. Failing to properly hire, supervise, and train JPSO deputies;
2. Failure to promulgate, train, and enforce an adequate and constitutional use of force policy;
3. Failure to promulgate, train, and enforce an adequate and constitutional policy on properly interacting with the mentally ill;
4. Failure to promulgate, train, and enforce an adequate and constitutional de-escalation tactics;
5. Failure to promulgate, train, and enforce an adequate and constitutional non-discriminatory law enforcement practices to protect African-American citizens of Jefferson Parish;
6. Failing to reprimand and discipline JPSO deputies who engage in misconduct;
7. Failing to retrain and/or otherwise control JPSO deputies who engage in excessive force;
8. Failing to follow appropriate policies and procedures to address and correct repeated use of excessive force;
9. Failing and inadequately investigating complaints and allegations of excessive force and other misconduct by JPSO deputies;
10. Failing to retrain and otherwise control JPSO deputies who engage in excessive force;
11. Tacitly approving of JPSO deputies using their power and position to interfere with other citizens' rights;
12. As a matter of both policy and practice Sheriff Lopinto facilitating this type of misconduct by failing to protect civilians from reckless indifference of Defendant's agents, servants, and employees in his sheriff's department; and
13. Failure to train, supervise, and discipline JPSO deputies regarding providing honest and accurate accounts of officer involved shootings to investigating authorities.

38.

As a direct result and proximate result of the conduct of Defendants John Doe #1 and John Doe #2, Plaintiffs have suffered and continue to suffer extraordinary damages, including the prolonged loss of liberty, emotional distress, and trauma, loss of the enjoyment of life, psychological harm, and pain and suffering, some of which may be permanent, as well as financial losses.

39.

The Plaintiff argues actions of John Doe #1 and John Doe #2 led to a series of events that led to further abuse and negligent care in the Jefferson Parish Prison (which is controlled by the Jefferson Parish Sheriff Office) until his release from the custody of JPSO, which ultimately led to the injuries suffered at East Jefferson Hospital.

40.

Collectively, the actions of all named Defendants, fall under the theory in Louisiana State Law of the "continuous tort doctrine.

**CAUSES OF ACTION**

**Count I**

**Federal Constitutional Claims**

**Plaintiff v. Defendant Lopinto in His Official Capacity, and**

**John Doe #1 and John Doe #2 in Their Individual Capacities**

41.

The actions or in actions of Sheriff Lopinto, John Doe #1, and John Doe #2 violated Mr. Tucker's rights under the Fourth and Fourteenth Amendments to be free from the unlawful use of force.

## Count II
### Federal Constitutional Claims
### Plaintiff v. Defendant Lopinto in His Official Capacity

42.

The actions or inactions of Defendant Lopinto violated Mr. Tucker's Fourth and Fourteenth Amendments Rights to the U.S. Constitution, directly or proximately causing his injury and suffering due to Defendant Lopinto's failure to train, supervise, and discipline John Doe #1 and John Doe #1.

43.

The actions or inactions of Defendant Lopinto violated Mr. Tucker's Fourth and Fourteenth Amendments Rights to the U.S. Constitution, directly or proximately causing his injury and suffering by creations of or failure to correct unconstitutional policies, practices, patterns, and/or customs.

44.

Sheriff Lopinto permitted, encouraged, tolerated, and knowingly acquiesced in an official pattern, practice or custom of JPSO Deputies, including JPSO Defendant Deputies, of violating the constitutional rights of the public at large, including Mr. Tucker.

45.

Sheriff Lopinto had been put on notice of the need for policy and training in the use of excessive force and race-based policing due to the numerous past injuries and deaths of persons in JPSO custody.

46.

The actions of the JPSO Deputy Defendants as described herein, were unjustified, unreasonable, unconstitutional, excessive and grossly disproportionate to the actions of Mr. Tucker, if any, and constituted an unreasonable search and seizure effectuated through the use of excessive force and a deprivation of Plaintiff's constitutional rights secured to him by the Fourth and Fourteenth Amendments of the United States Constitution.

47.

The actions of the JPSO Deputy Defendants described herein were in direct violation of the constitution, law and regulations of the United States and the State of Louisiana.

48.

Sheriff Lopinto condoned, approved, ratified, facilitated and knowingly acquiesced in the actions of the Defendant Deputies described herein by failing to properly investigate, discipline and hold accountable the Defendant Deputies for their actions.

49.

The violations of Plaintiff's constitutional rights under the Fourth and Fourteenth Amendments to the U.S. Constitution, Plaintiff's damages, and/or the conduct of the individual

Defendants were directly and proximately caused by the actions and/or inactions of Defendants Lopinto, who has encouraged, tolerated, ratified, and has been deliberately indifferent to the following policies, patterns, practices, and customs, and to the need for more or different training, supervision, investigation, or discipline in the areas of (wherein the terms "officers" and "deputies" may be used interchangeably):

a. Use of force by police officers;

b. Police officers' duties and responsibilities to engage in proper de-escalation techniques;

c. The proper exercise of police powers, including not limited to the making of an arrest and the use of deadly force;

d. Officers' duties not to properly handle citizens suffering mental health emergencies;

e. Non-race-based policing and use of force;

f. The monitoring of officers whom it knew or should have known were suffering from emotional and/or psychological problems that impaired their ability to function as officers;

g. The failure to identify and take remedial or disciplinary action against officers who were the subject of prior civilian or internal complaints of misconduct;

h. Failing to retrain and/or otherwise control officers who engage in excessive force and/or unjustified shooting against civilians;

i. Failing to follow appropriate policies and procedures to address and correct repeated use of excessive force;

j. The hiring and retention of officers who are unqualified for their employment positions;

k. Failure to require, discipline, and supervise their deputies/officers for not reporting illegal, impermissible, improper, or any other conduct of other deputies/officers that is unbefitting of an officer or violates department policies and protocols;

l. Officers' use of their status as officers to employ the use of force or to achieve ends not reasonably related to their law enforcement duties;

m. The failure of officers to follow established policies, procedures, directive, and instructions regarding arrests, use of force, and institution of criminal charges under such circumstances as presented by this case;

n. The failure to properly sanction or discipline deputies who are aware of and conceal and/or aid and abet violations of constitutional rights of citizens by other deputies/officers;

o. As a matter of both policy and practice, Defendant Lopinto facilitating this type of misconduct by failing to protect civilians from reckless indifference or their departments' agents, servants, and employees.

50.

Sheriff Lopinto was on actual or constructive notice of the deficiencies with the policies, practices and customs of his department that make deputy misconduct a foreseeable consequence.

51.

Sheriff Lopinto knew, must have known, or should have known that the above-referenced policies, practices, and/or customs, would likely lead to serious injury or death to citizens and that such injuries were foreseeable; yet, disregarded that risk.

52.

The aforementioned policies, practices and customs were inadequate in relation to the specific tasks their deputies/officers must routinely perform and with respect to activities where there is an obvious need for proper policies, practices and customs and therefore, illustrated its deliberate indifference and/or reckless disregard to the consequences of officer misconduct.

53.

Sheriff Lopinto's above referenced policies, practices and/or customs violated the Plaintiff's constitutional rights; and said policies, practices and/or customs were the moving force behind and proximate cause of said violations.

56.

Sheriff Lopinto's above referenced policies, practices and/or customs demonstrated a deliberate indifference to the constitutional rights of the public, including the Plaintiff, and was the proximate cause of the injuries and damages sustained by the Plaintiff, and evidenced a reckless or callous indifference to the federally protected rights of the Plaintiff.

57.

By failing to recognize or correct the deficiencies with their policies, practices and customs, Sheriff Lopinto consciously disregarded the known and foreseeable consequences thereof.

58.

Sheriff Lopinto's deliberately indifferent policies, practices and customs were the moving force behind Plaintiff's injuries and the deprivation of his constitutional rights.

59.

There is a direct causal link between the policies, practices and customs and the injuries to and violation of Plaintiff's constitutional rights.

60.

As a direct and proximate result of the foregoing policies, practices and customs of Sheriff Lopinto, the violation of the constitutional rights of the public by JPSO deputies was

substantially certain to occur.

## Count III

## State Law Claims

## Plaintiff v. Defendants John Doe #1 and John Doe #2 In Their Individual Capacities

61.

Plaintiffs allege that Defendants John Doe #1 and John Doe #2 are responsible and liable for the damages and injuries Plaintiff has suffered as a result of said Defendants' actions and/or inactions pursuant to Louisiana Code of Civil Procedure Article 2315, which provides that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it"; Article 2316, which provides that "[e]very person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill"; and Article 2317, which provides that "[w]e are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody."

62.

The actions and/or inactions of Defendants John Doe #1 and John Doe #2 under the law of the State of Louisiana, constitute the intentional torts of:

a.  Assault;

b.  Battery;

c.  Aggravated Battery;

d.  Intentional Infliction of Emotional Distress.

## Count IV

## State Law Claims

## Plaintiff v. Defendant Lopinto in His Official Capacity

18

63.

Plaintiffs allege that Defendant Lopinto is responsible and liable for the damages and injuries Plaintiff has suffered as a result of Defendants John Doe #1 and John Doe #2 actions and/or inactions pursuant to Louisiana Code of Civil Procedure Article 2315, which provides that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it"; Article 2316, which provides that "[e]very person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill"; Article 2317, which provides that "[w]e are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody"; and Article 2320, which provides that "[m]asters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed…responsibility only attaches, when the masters or employers…might have prevented the act which caused the damage, and have not done it."

64.

The actions and/or inactions of Defendant Lopinto under the law of the State of Louisiana, constitute the torts of:

    a.  Assault;

    b.  Battery;

    c.  Aggravated Battery;

    d.  Intentional Infliction of Emotional Distress;

    e.  Negligent Hiring;

f.   Negligent Retention;

g.   Negligent Supervision;

h.   Malfeasance in Office.

## COUNT V

### State Law Claims

### Plaintiff vs. East Jefferson Hospital and Seaside Healthcare, Inc.

65.

The Plaintiff avers that Seaside was operating a behavioral health center inside of EJGH at the time of Mr. Tucker's injuries.

66.

The Plaintiff avers that both Seaside and EJGH both bear responsibility for the medical care, supervision, and well being of Mr. Tucker.

67.

Included in the well-being of Mr. Tucker is the maintaining of a safe premise for those suffering from mental health conditions.

68.

The Plaintiff contends that both EJGH and Seaside knew that Mr. Tucker was suffering from Bi-polar Schizophrenia.

69.

This is evident based on his medical records and the fact that the 3rd floor (where Mr. Tucker was residing) at EJGH is used by Seaside to house individuals needing inpatient treatment.

70.

Both EJGH and Seaside should have known that individuals suffering from mental health

and other behavioral disorders have the propensity to be a danger to themselves and others.

71.

Thus, it is reasonable to foresee the potential for a patient to harm themselves either in an attempt to commit suicide or escape.

72.

The Plaintiff argues that none of the windows on the 3rd floor of EJGH should have been accessible to open out of the reasonable expectation that a patient suffering from a mental health or behavioral condition would try to commit suicide or escape.

73.

By having open accessible windows on the 3rd floor of EJGH, created a foreseeable dangerous environment for not only the patients, but members of the general public.

74.

The Plaintiff avers that both EJGH and Seaside are responsible under the Louisiana State law tort theory of premise liability:

§2800.6. Burden of proof in claims against merchants
  A.  A merchant owes a duty to persons who use his premises to exercise reasonable care to keep his aisles, passageways, and floors in a reasonably safe condition. This duty includes a reasonable effort to keep the premises free of any hazardous conditions which reasonably might give rise to damage.
  B.  In a negligence claim brought against a merchant by a person lawfully on the merchant's premises for damages as a result of an injury, death, or loss sustained because of a fall due to a condition existing in or on a merchant's premises, the claimant shall have the burden of proving, in addition to all other elements of his cause of action, all of the following:
  (1)  The condition presented an unreasonable risk of harm to the claimant and that risk of harm was reasonably foreseeable.
  (2)  The merchant either created or had actual or constructive notice of the condition which caused the damage, prior to the occurrence.
  (3)  The merchant failed to exercise reasonable care. In determining reasonable care, the absence of a written or verbal uniform cleanup or safety

procedure is insufficient, alone, to prove failure to exercise reasonable care.

C.  Definitions:

(1)  "Constructive notice" means the claimant has proven that the condition existed for such a period of time that it would have been discovered if the merchant had exercised reasonable care. The presence of an employee of the merchant in the vicinity in which the condition exists does not, alone, constitute constructive notice, unless it is shown that the employee knew, or in the exercise of reasonable care should have known, of the condition.

(2)  "Merchant" means one whose business is to sell goods, foods, wares, or merchandise at a fixed place of business. For purposes of this Section, a merchant includes an innkeeper with respect to those areas or aspects of the premises which are similar to those of a merchant, including but not limited to shops, restaurants, and lobby areas of or within the hotel, motel, or inn.

**JURY TRIAL DEMAND**

75.

The Plaintiffs request a trial by jury.

**PRAYER FOR RELIEF**

76.

The Plaintiffs respectfully request:

a.  Compensatory damages as to all Defendants;

b.  Special Damages as to all Defendants;

c.  Punitive damages as to all defendants sued in their individual capacity;

d.  Reasonable attorneys' fees and costs as to all Defendants;

e.  Such other and further relief as may appear just and appropriate

WHEREFORE, Devin Tucker prays that a copy of the above petition is served upon all of the Defendants named herein, and that after all proceedings a judgment is rendered in favor of Plaintiff and against Defendants for all relief deemed equitable under the law including

attorney's fees and costs.

Respectfully submitted,

_/s/Lance C. Unglesby_____
Lance C. Unglesby (#29690)
Lewis O. Unglesby (#12498)
Adrian M. Simm, Jr. (36673)
UNGLESBY LAW FIRM
246 Napoleon Street
Baton Rouge, LA 70802
Phone: (225) 387-0120
lance@unglesbylaw.com
lisa@unglesbylaw.com
adrian@unglesbylaw.com

Dedrick A. Moore (#30329)
DEDRICK A. MOORE
ATTORNEYS AT LAW, LLC
4962 Florida Blvd Baton
Rouge, LA 70806
Phone: (225) 412-0412
Fax: (225) 412-0414

Attorneys for the Plaintiff